UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JERRY KIRBY, )<br>)<br>*Plaintiff,* )<br>v. )<br>)<br>DIVERSIFIED FABRICATIONS, INC., )<br>and ARCH CHEMICAL COMPANY, INC. )<br>)<br>*Defendant.* ) | No. 1:08-cv-83<br>*Edgar* |

**MEMORANDUM**

Plaintiff Jerry Kirby brings this negligence action against Defendants Diversified Fabrications, Inc. ("Diversified") and Arch Chemical Company, Inc. ("Arch Chemical") (collectively "Defendants") for injuries sustained by Mr. Kirby. This court has jurisdiction pursuant to 28 U.S.C. § 1332 due to the diversity of the parties.

Defendants have both filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [Court Doc. Nos. 4 and 11]. The motions are now ripe for review. After careful consideration of the record and the applicable law, the court has determined that it will **GRANT** Arch Chemical's motion to dismiss and **DENY** Diversified's motion to dismiss.

**I. Background**

The Plaintiff's complaint provides the following facts. [Court Doc. No. 1-2 ("Complaint")]. Plaintiff is a resident of Chattanooga, Tennessee. Diversified is an Alabama corporation that manufactures and ships metal equipment. Complaint, ¶¶ 2-3. Defendant Arch Chemical is a citizen of Virginia and Connecticut that manufactures and processes chemical products. *See* [Court Doc. No. 1, Petition for Removal]. Plaintiff worked for Mack Kirby on August 31, 2007, and on that day he "was dispatched in a 2006 Ford Diesel Truck pulling a 40-

foot flat bed 'goose neck' steal [sic] trailer to pick up several pieces of metal equipment at

Diversified's factory in Oneonta, Alabama and carry them to Arch's place of business in

Charleston, Tennessee." Complaint, ¶ 4. The Complaint next recounts the following events:

> Kirby arrived at Diversified late in the day on August 31, 2007. After arriving at Diversified, agents or employees of Diversified loaded three large pieces of metal equipment onto Kirby's truck. These pieces of equipment together weighed 9500 pounds. . . .
> One of the pieces of metal equipment loaded on Kirby's truck was a large "cone shaped" piece that weighed approximately 6000 pounds. It was loaded on the trailer by a crane operated by employees or agents of Diversified. It was approximately seven feet in height, eleven feet in length, and eight feet in width. After loading the metal pieces onto the trailer, agents or employees of Diversified "cinched down" the pieces of metal with metal chains to secure them.
> The "cone shaped" piece was improperly and negligently loaded by Diversified and as a result was unstable and dangerous.
> After the trailer was loaded, Kirby drove the truck to a steel mill in Birmingham, Alabama where additional freight was loaded. This did not disturb the metal pieces loaded by Diversified. He then drove to the location of Arch in Charleston, Tennessee. . . .
> Upon arrival at Arch, Kirby was directed by its employees or agents to drive the truck to the rear of the plant. A mobile crane was brought to the truck. Kirby climbed onto the trailer and began removing the straps and chains from the "cone shaped" metal item. After he had removed all but one chain, Kirby climbed off the trailer. Then an employee or agent of Arch said "you going to get your short chain off". Kirby climbed back onto the trailer to remove the final chain so that Arch's employees or agents could unload it with the crane. . . .
> After doing what he was asked to do, Kirby turned from the piece of metal and was preparing to climb off the trailer when one of the employees or agents called "watch out Jerry". Kirby looked back and saw that the "cone shaped" piece of metal was tipping over and falling in his direction. Because he was still standing on the trailer, he felt his only option was to try to hold the piece in place long enough for the employees or agents of Arch to assist him.
> Kirby's attempt to hold the piece of metal in place was futile. In desperation, he jumped from the trailer. When he hit the ground he fell, landing on the pavement on his side. The "cone shaped [sic] metal then fell onto him pinning him to the ground.
> Two of Arch's employees or agents ran to Kirby and tried to lift the steel piece off of him. They were able to shift its weight enough for Kirby to pull his legs out from under it.
> The force of the metal landing on Kirby caused excruciating pain and resulted in severe injuries to his feet and legs. . . .

Complaint, ¶¶ 5-13. Plaintiff seeks compensation from Defendants for these injuries. He claims that Diversified's employees negligently loaded the metal equipment onto his truck and that Arch Chemical's employees "negligently failed to alert Kirby to the danger posed by the 'cone shaped' piece being improperly loaded, negligently failed to take responsibility for the unloading, and negligently failed to properly oversee Kirby's attempt to unload the metal pieces." *Id.* at ¶ 9.

## II.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court "must read all well-pleaded allegations of the complaint as true." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996)). In addition, a court must construe all allegations in the light most favorable to the plaintiff. *Bower*, 96 F.3d at 203 (citing *Sinay v. Lamson & Sessions*, 948 F.2d 1037, 1039 (6th Cir. 1991)).

The Supreme Court has recently explained "an accepted pleading standard" that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, __ U.S. ___, 127 S.Ct. 1955, 1969 (2007). The complaint "must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner*, 108 F.3d at 88 (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)). In *Twombly* the Supreme Court emphasized that:

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

127 S.Ct. at 1964-65 (citations omitted). *See also, Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986) (noting that "[a]lthough for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation").

### III. Analysis

Tennessee law requires the proof of five elements to sustain a negligence claim: "(1) a duty of care owed by the defendant to the plaintiff, (2) conduct by the defendant breaching that duty, (3) an injury or loss to the plaintiff, (4) causation in fact, and (5) proximate or legal cause." *Waste Management, Inc. of Tennessee v. South Central Bell Telephone Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997) (citing *McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. Sup. Ct. 1991)). As Tennessee courts have noted, "[t]he existence of a duty owed to the plaintiff by the defendant is a necessary ingredient in every negligence action." *White v. Metropolitan Government of Nashville*, 860 S.W.2d 49, 51 (Tenn. Ct. App. 1993) (citing *McClenahan*, 806 S.W.2d at 774); *Shouse v. Otis*, 448 S.W.2d 673, 676 (Tenn. Sup. Ct. 1969); *Fly v. Cannon*, 813 S.W.2d 458, 461 (Tenn. Ct. App. 1991)).

Duty is defined as "a legally recognized obligation to conform to a particular standard of conduct toward another. It is a reflection of society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from

another's conduct." *White*, 860 S.W.2d at 51 (citing *Lindsey v. Miami Dev. Co.*, 689 S.W.2d 856, 858 (Tenn. Sup. Ct. 1985); *Nichols v. Atnip*, 844 S.W.2d 655, 661 (Tenn. Ct. App. 1992)).

In *White* the Tennessee appellate court expanded on the notion of duty:

> All persons have a duty to use reasonable care in light of the surrounding circumstances to refrain from conduct that could foreseeably injure others. Since reasonable care is a flexible concept, this court has recognized that some occasions and circumstances may require a higher degree of care than others. Duty is the standard by which the reasonableness of conduct is measured. Conduct consistent with an actor's duty in particular circumstances is not negligent; while conduct falling below the applicable standard of care is. Thus, the standard of care is intimately related to an actor's duty and relates to what an actor must do or refrain from doing in order to satisfy the applicable duty. . . . Courts customarily define the scope of a duty or a particular standard of care by looking to the statutes, regulations, principles, and other precedents that make up the law. However, they may also consider evidence that tends to establish a custom representing the common judgment concerning the risks of a particular situation and the precautions required to meet them.

860 S.W.2d at 52. The existence of a duty is a legal question. *See Henry v. Bi District Board of Urban Ministry, Inc.*, 54 S.W.3d 287, 290 (Tenn. Ct. App. 2001); *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990). The existence of a duty arises:

> when "the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." The Supreme Court has set forth several factors to be considered in determining whether a risk is unreasonable, including
>
>> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

*Henry*, 54 S.W.3d at 290 (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. Sup. Ct. 1995)).

As one appellate court decision described, "[d]uty in the context of a case where negligence is alleged raises the question of whether the defendant is under any obligation required by law for the benefit of the particular plaintiff." *Dooley*, 805 S.W.2d at 384 (citing 57A Am.Jur.2d *Negligence* §§ 84, 85 (1989)). Further, "[o]ne does not have an affirmative duty to act for the protection of a third party unless he or she 'stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'" *Draper v. Westerfield*, 181 S.W.3d 283 (Tenn. Sup. Ct. 2005) (quoting *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. Sup. Ct. 1997)). A special relationship, such as between carriers and passengers, innkeepers and guests, employers and employees, landowners and invitees, and hosts and social guests, may create a duty. *See Marr v. Montgomery Elev. Co.*, 922 S.W.2d 526, 529 (Tenn. Ct. App. 1995). However, "a special relationship requires the capacity or authority to control the other party." *Id.* at 530. "With respect to the meaning of 'special relation' as that term is used in § 315(a) of the Restatement, Tennessee courts have found that there is no 'special relation' such as to impose upon the defendant a duty to control a third party's conduct unless the defendant has the means and ability to so control the conduct of the third party." *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 100 (Tenn. Ct. App. 2001) (citing *Newton v. Tinsley*, 970 S.W.2d 490, 493 (Tenn. Ct. App. 1997)).

Arch Chemical asserts that as the recipient of the shipped goods, it owed no duty to Plaintiff. Plaintiff argues that Arch Chemical may be liable because it exercised control over the situation, relying on *Lindsey v. Miami Develop. Co.*, 689 S.W.2d 856 (Tenn. Sup. Ct. 1985). In *Lindsey* the court addressed a situation in which the defendant "assumed control of the situation which placed him under the obligation to exercise reasonable care to render aid to" the plaintiff.

689 S.W.2d at 860. The court described this duty as follows:

> "Without regard to whether there is a general duty to aid a person in distress, there is a clearly recognized legal duty of every person to avoid any affirmative acts which may make a situation worse. '[I]f the defendant does attempt to aid him, and takes charge and control of the situation, he is regarded as entering voluntarily into a relation which is attended with responsibility. Such a defendant will then be liable for a failure to use reasonable care for the protection of the plaintiff's interests.' . . . 'Where performance clearly has been begun, there is no doubt that there is a duty of care.'"

*Lindsey*, 689 S.W.2d at 860 (quoting *Farwell v. Keaton*, 240 N.W.2d 217, 220 (Mich. Sup. Ct. 1976)); *see also Marr v. Montgomery Elev. Co.*, 922 S.W.2d 526, 529 (Tenn. Ct. App. 1995). The questions of whether "one has assumed a duty to act is also a question of law." *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. Sup. Ct. 2000). In *Lindsey* the plaintiff had fallen from a balcony and needed medical assistance. The defendant assumed control by telling a crowd that had gathered around the plaintiff to wait a few minutes before calling an ambulance. 689 S.W.2d at 860.

However, the *Lindsey* case is inapposite here. Arch Chemical did not fail to render aid or medical assistance to the Plaintiff in this case as the defendant in *Lindsey* did, nor does the Plaintiff claim that it did so. Plaintiff claims that Arch Chemical failed to alert Plaintiff to the danger caused by improper loading and failed to take responsibility for the unloading. However, Plaintiff cites no authority suggesting that the purchaser of a shipment of goods has the duty to supervise the unloading of those goods or the duty to prevent injury to the employee of a common carrier delivering those goods. Nor does Plaintiff explain how Arch Chemical's employees would have any knowledge of the improper loading of the cone-shaped piece of metal.

In one Tennessee appellate court decision, a purchaser of goods claimed it was not liable

for injury to a truck driver who worked for a company responsible for shipping the goods from the shipper to the purchaser. *See Cleveland Wrecking Co. v. Butler*, 421 S.W.2d 380 (Tenn. Ct. App. 1967). The purchaser "insist[ed] that there [was] no basis for holding it liable for such negligence, if any, as may have occurred." *Id.* at 388. The court agreed, noting that the purchaser's contention was "well-founded" and "determinative" of the purchaser's liability. *Id.* The court described the situation in the following manner:

> [The defendant], by the pleading of the plaintiff, is in the position of a purchaser of material who has engaged an independent transportation agency to transport its material from a distant point where it is loaded by the seller without any control or supervision by the purchaser.
> We have been unable to find any basis, either in the testimony in the record, or in the authorities cited by appellee, for a holding that the purchaser-consignee has any duties whatsoever as to the manner of loading of the shipment.
> . . . We cannot say without proof or authority that a load of scrap iron is so inherently dangerous that one who purchases same should send an inspector to the point of origin to make sure that the seller has properly loaded it and that the transportation agency has properly checked and verified the loading. . . . As a matter of common sense and reason, the general rule must be that a purchaser who purchases a cargo already loaded upon a transportation device has no duty to supervise either the seller who loaded the cargo or the transportation agency which accepts and transports the load, and this general rule must be so devoid of exception that no reported case has ruled otherwise.

*Id.* at 389.

In this case Arch Chemical is analogous to the purchaser in *Cleveland Wrecking Co.* Plaintiff has cited nothing suggesting that the recipient of a shipment of goods bears any kind of responsibility for the safety of the employee of the common carrier unloading the cargo. Although Plaintiff suggests that Arch Chemical's employees took control of the situation and should therefore be liable, no authority supports this proposition. Further, the Complaint does no more than allege that Arch Chemical's employees asked Plaintiff if he was going to remove the final chain attaching the shipment to his truck so that the cargo could be unloaded. The facts, as

-8-

alleged in the Complaint, do not demonstrate how Plaintiff can prove the elements of a negligence claim against Arch Chemical. Therefore, the court will **DISMISS** this action against Arch Chemical.

Diversified is in a different situation from Arch Chemical. Plaintiff's Complaint alleges that Diversified was the shipper of goods. It is true that federal carrier safety regulations place a burden of safely securing a load for interstate transport on the shipper. The regulations provide in pertinent part:

> General. A driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless–
> (1) The commercial motor vehicle's cargo is properly distributed and adequately secured as specified in §§ 393.100 through 393.136 of this subchapter. . . .
> (b) Drivers of trucks and truck tractors. Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must–
> (1) Assure himself/herself that the provisions of paragraph (a) of this section have been complied with before he/she drives that commercial motor vehicle;
> (2) Inspect the cargo and the devices used to secure the cargo within the first 50 miles after beginning a trip and cause any adjustments to be made to the cargo or load securement devices as necessary, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from the commercial motor vehicle; and
> (3) Reexamine the commercial motor vehicle's cargo and its load securement devices . . .

49 C.F.R. § 392.9(a)-(b).

However, although the carrier bears some responsibility for inspecting the safety of his loads, the shipper may not be absolved from all responsibility for loading a common carrier safely. In *United States v. Savage Truck Line, Inc.* the Fourth Circuit outlined what is known as the "shipper exception":

> The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be

-9-

discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper. This rule is not only followed in cases arising under the federal statutes by decisions of the federal courts but also for the most part by the decisions of the state courts.

209 F.2d 442, 445 (4th Cir. 1954) (citations omitted); *see also Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865 (4th Cir. 1984). Tennessee courts have cited the *Savage* case with approval when discussing liability for damages to goods being shipped. *See Wayne Knitting Mills v. Delta Motor Lines*, 372 S.W.2d 419, 424 (Tenn. Ct. App. 1963); *see also Herring v. Coca-Cola Enterprises*, No. E2007-01295-COA-R3-CV, 2008 WL 787871 (Tenn. Crim. App. Mar. 26, 2008) (applying Georgia law of assumption of risk and relying on rules outlined in *Savage* and *Franklin Stainless Corp.*). In *Wayne Knitting Mills* the Tennessee appellate court stated the general rule in this way:

> "the general rule is that when the shipper assumes the responsibility of loading, the carrier is not liable where the defects in loading are latent or concealed so that they cannot be discovered by ordinary inspection and observation, but if the improper loading is apparent, that is, if it is a fact which addresses itself to the ordinary observation of the carrier or its servants, the carrier will be held liable notwithstanding the negligence of the shipper or his agents."

*Id.* at 425 (quoting 44 A.L.R.2d 993).

In 1972 this court also applied the *Savage* rule, noting that:

the *Savage* case expressly approved, . . . of the general rule that "when the shipper assumes the responsibility of loading, the carrier is not liable where the defects in loading are latent or concealed so that they cannot be discovered by ordinary inspection and observation." It should be noted that the liability referred to here is liability for damage to the cargo, not liability to injured third parties. However, it would appear clear that if the carrier were not liable to the shipper for damage to the cargo because of the shipper's negligence, neither would it be liable to indemnify the shipper for the shipper's liability for negligent injury to a third party. . . The carrier's duty to inspect for the security of a cargo loaded by the shipper is not an absolute duty exonerating the shipper in every case from the shipper's own negligence in loading. Rather, the carrier has a duty to make a

reasonable inspection and to observe and correct defects or insecurities in loading that are capable of being discovered in the course of a reasonable inspection.

*Georgia Kraft Co. v. Terminal Transport Co.*, 343 F.Supp. 1240, 1247-48 (E.D. Tenn. 1972); *see also Pierce v. Cub Cadet Corp.*, No. 87-5936, 875 F.2d 866, 1989 WL 47446 *4 (6th Cir. May 9, 1989).

In this case the Complaint alleges that Diversified's employees took responsibility for loading the metal equipment onto Kirby's truck. Therefore, it is possible that the "shipper's exception" may apply if Diversified's employees failed properly to load the equipment and if the defect was latent or not obvious to Kirby. These are facts which cannot be determined at the pleading stage. Therefore, because it is possible that Diversified negligently loaded the equipment and the defective loading was not obvious, Plaintiff's Complaint may succeed in stating a claim of negligence. Therefore, this Court will **DENY** Diversified's motion to dismiss.

## IV. Conclusion

Based on the analysis outlined *supra*, this Court will **GRANT** Arch Chemical's motion to dismiss Plaintiff's action. Further, the Court will **DENY** Diversified's motion to dismiss Plaintiff's action.

A separate order will enter.

                                  */s/ R. Allan Edgar*
                                  R. ALLAN EDGAR
                       UNITED STATES DISTRICT JUDGE